GREYHOUND COMPUTER CORPORA-
TION, INC., Plaintiff-Appellant,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
Defendant-Appellee.

No. 72–2553.

United States Court of Appeals,
Ninth Circuit.

Aug. 17, 1977.

Edward L. Foote, Edward J. Wendrow, Stephen B. Diamond, Winston, Strawn, Smith & Patteson, Chicago, Ill., argued, for plaintiff-appellant.

Thomas D. Barr, Frederick A. O. Schwarz, Jr., Cravath, Swaine & Moore, New York City, argued, for defendant-appellee.

Before BROWNING, MOORE,* and WALLACE, Circuit Judges.

BROWNING, Circuit Judge:

Greyhound Computer Corporation brought this action against International Business Machines Corporation alleging IBM had monopolized or attempted to monopolize various markets in the electronic data processing industry in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Greyhound also charged IBM with breaching contracts to provide certain services in conjunction with the sale of computer equipment. After presentation of Greyhound's case the district court granted IBM's motion for a directed verdict. This appeal followed.

We affirm the directed verdict on the contract issue, but reverse and remand for trial of the monopolization and attempt to monopolize claims.

### I. Factual Background and Standard of Review

The computer industry, which is little more than 25 years old, has witnessed the introduction of three (and possibly four) "generations" of equipment, each generation representing a major technological advance. The first computers, introduced in 1952, were built with vacuum tubes. The second generation, introduced in 1958, utilized transistor technology. In 1964 IBM introduced the third generation with the System 360 family of computers, employing integrated circuits and other advances. In 1970 IBM announced an improved third (or possibly fourth) generation, the System 370 line. Because the electronic components of second and third generation equipment are virtually indestructible, the life of this equipment is a function of price and technological obsolescence rather than wear from usage.

---

\* Honorable Leonard P. Moore, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

A computer system consists of a central processing unit (or "mainframe") and peripheral equipment. Peripheral equipment includes means for storing information such as disk and tape drives, and input and output devices such as printers and terminals. Programmed instructions, or software, must be designed to enable the equipment to perform particular functions. Computer systems vary greatly in size and capacity to perform specified tasks.

IBM manufactures entire computer systems, including mainframes and peripherals. It also provides software and support services to its customers. Like other manufacturers, IBM both leases and sells its computers.

Greyhound is a leasing company; it does not manufacture computers. It buys computers from others and leases them in competition with computer manufacturers and other leasing companies.[1]

Greyhound is both a customer and competitor of IBM. Greyhound's antitrust claim is that IBM restricted sales of its computer equipment in order to monopolize the leasing market in which Greyhound competes. Greyhound's contract claim is that IBM breached an obligation to provide services to Greyhound's lessees.

The district court granted the motion for a directed verdict on the antitrust claim because (1) the evidence was insufficient to establish a relevant market and IBM's share of the market; (2) the evidence was insufficient to establish IBM's control of a market; (3) the share of any market IBM holds "has been achieved as a result of superior skill, foresight, and industry"; (4) IBM's activity of which Greyhound complains was a competitive response to economic factors over which IBM had no control; and (5) Greyhound's damages were "purely speculative." The court directed the verdict on the contract claim because the evidence was insufficient and because the claim was barred by the parol evidence rule, the statute of frauds, and local rules of court.

The standard on review of a directed verdict favors Greyhound. We are "bound to view the evidence in the light most favorable to [Greyhound] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).[2]

## II. *Monopolization*

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).[3]

---

1. Leasing companies operate on the premise that the useful life of a computer system will exceed the manufacturer's expectation as reflected in the manufacturer's rental rates. Because leasing companies calculate that the equipment will have a longer economic life, they charge less, assume the risk of technological obsolescence, and rely on their ability to lease the equipment long enough to make a profit. *See* ABA Standing Committee on Law and Technology, Computers and the Law 125–26 (2d ed. 1969).

2. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1356 (9th Cir. 1976); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 684 (9th Cir. 1976); *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.*, 498 F.2d 1137, 1140

(9th Cir. 1974); *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 13 (9th Cir. 1973); *Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825, 830 (9th Cir. 1971); *Juhnke v. EIG Corp.*, 444 F.2d 1323, 1325 (9th Cir. 1971); *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 452 (9th Cir. 1966), *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

3. *See also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270 (9th Cir. 1975); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 209 (9th Cir. 1974); *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 458 (9th Cir. 1966), *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

## A. The Relevant Market

Greyhound's major contention is that IBM has monopolized or attempted to monopolize a submarket for leasing general purpose digital computers for commercial application. Greyhound also contends that IBM has monopolized or attempted to monopolize a separate submarket for IBM's own product line.

The question is whether Greyhound offered evidence from which the jury could have reasonably concluded that the submarkets which Greyhound defined were sufficiently distinct in commercial reality to permit a company that dominated these submarkets to exclude competition and control prices. This depends upon whether efforts to exclude competition or control prices in the submarkets in question would be negated by a shift of buyers to other portions of the market.[4]

IBM does not challenge the adequacy of Greyhound's evidence to establish a market limited to general purpose digital computers for commercial applications. It does argue, however, that the evidence will not support a finding that leasing constitutes a separate submarket. IBM also contends that the record does not establish a submarket defined exclusively in terms of IBM's product line.

■ From the record the jury could have concluded that the market for general purpose computers for commercial applications was distinguishable economically from the market for "dedicated application" computers or other general purpose systems, including minicomputers, process control computers, and large scientific computers.[5] Greyhound offered evidence that other computers are not reasonably interchangeable with general purpose commercial systems, and that no significant substitution in fact takes place.[6] Other evidence indicated that computer systems manufacturers tend to specialize in but one of these types of computers, that the industry and its customers recognized these categories of computers, and that the various categories have distinct prices and distinct sets of competitors employing different marketing techniques. See Brown Shoe Co. v. United

4. See, e. g., United States v. Grinnell Corp., 384 U.S. 563, 571, 572–74, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 380, 393–95, 400, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 612 n.31, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); International Tel. & Tel. Corp. v. General Tel. & Elec. Corp., 518 F.2d 913, 932–33 (9th Cir. 1975); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1271 (9th Cir. 1975). Attempts to exclude competition or control prices may also be checked if other suppliers shift their production facilities to the product in question. Brown Shoe Co. v. United States, supra, 370 U.S. at 325 n.42, 82 S.Ct. 1502; United States v. Empire Gas Corp., 537 F.2d 296, 303 (8th Cir. 1976); Twin City Sportservice, Inc. v. Charles O. Finley & Co., supra, 512 F.2d at 1271. However, neither IBM nor the record suggests that industries not presently engaged in the leasing of general purpose commercial systems could have shifted their operations to such a business readily.

5. One witness testified that general purpose digital systems are "designed to be internally programmed and store data internally and could be applied to a broad variety of applica-

tions, in principally commercial, also scientific and engineering environments." The general purpose systems suitable for commercial application are those that "can be, without undue burden and effort . . . programmed and applied efficiently to the type of applications that one incurs in a business or commercial environment."

Minicomputers are used primarily in instrumentation and industrial automation, and are suited for customers whose computer requirements are relatively simple and stable in character. Process control computers are used for control and measurement of industrial process. Large scientific computers (dubbed "number crunchers") focus on "certain portions of the scientific and government community who are interested in intensively high calculations."

6. There is evidence in the form of an editorial in a trade journal that design changes in the new minicomputers make them "a reasonable alternative" to full-sized general purpose machines. In view of the unreliability of such evidence and the substantial nature of the evidence of differentiation presented by Greyhound, the jury was free to conclude that minicomputers were not readily substitutable for general purpose systems.

*States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).[7] This evidence was sufficient to support a jury conclusion that the market for general purpose computer systems for commercial applications constitutes a relevant market for antitrust purposes.

It is a closer question whether the evidence would permit a jury finding that leasing general purpose computers for commercial applications constituted a submarket economically distinct from others in which such computers are made available to users. We conclude, however, that such a finding would have been justified.

■ No rule of law or economic principle bars application of section 2 of the Sherman Act to one of several alternative means of distributing a product. The statute prohibits monopolization of "any part" of interstate or foreign commerce. Accordingly, the Sherman Act and other antitrust statutes have been applied to protect competition in one of alternate channels of distribution.[8]

The record indicates that data processing services are distributed to users by: (1) sale of computer systems, (2) lease of computer systems, (3) time-sharing,[9] or (4) contracting with service bureaus.[10] The latter two are the most clearly discrete. There was

ample evidence that service bureaus and time-sharing arrangements do not provide an acceptable alternative to those who might buy or lease computer systems. Greyhound offered testimony that time-sharing and service bureaus are addressed to needs different from those served by an installed computer,[11] that purchasers and lessees of computers do not consider service bureau and time-sharing arrangements an acceptable substitute, and that leasing companies do not consider suppliers of these services to be their competitors.

■ The evidence is not so clear that leasing general purpose computers constitutes a market distinct from selling. Considering the weighty presumption in favor of a jury determination, however, we conclude the evidence was sufficient.

Leases and sales serve different customer needs. Greyhound offered testimony that general purpose commercial computers are purchased by banks, insurance companies, and other businesses with predictable long-term data processing needs and the capacity to undertake long-term financial commitments. Computers are leased by customers that have variable business requirements and a need to keep abreast of advancing technology. A single company with a variety of problems may purchase a computer to perform one task and lease a computer to

---

7. *Brown Shoe* involved a claim under § 7 of the Clayton Act, but is equally applicable to cases arising under § 2 of the Sherman Act. *United States v. Grinnell Corp.,* 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). *See, e. g., Knutson v. The Daily Review, Inc.,* 548 F.2d 795, 804 (9th Cir. 1976).

As the Supreme Court said in *Grinnell,* "We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." 384 U.S. at 573, 86 S.Ct. at 1705.

8. *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825, 830 (9th Cir. 1971) (Sherman Act); *Columbia Broadcasting System, Inc. v. FTC,* 414 F.2d 974, 978–79 (7th Cir. 1969) (Federal Trade Commission Act); *Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey,* 160 F.Supp. 568, 576–77 (D.N.J. 1958), *aff'd,* 263 F.2d 715 (3d Cir. 1959) (Sherman Act). *See generally C. A. R. Leasing, Inc.*

*v. First Lease, Inc.,* 394 F.Supp. 306 (N.D.Ill. 1975) (Sherman Act).

9. One witness testified, "Time sharing is a system of using a computer whereby a user has a terminal of some capability, some small, some large, and the terminal is hooked to the computer via telephone line at some remote distance, and this allows the user to access the computer through the telephone lines and through his terminal."

10. According to one witness, "A service bureau is a form of business which utilizes data processing equipment to provide a service, and for which the owner of the service bureau charges some fee for the services rendered on his computers."

11. Time-sharing and service bureau arrangements are suitable only for processing requirements entailing a small input.

perform another.[12] Because lessees retain the option to cancel (albeit at some penalty), even the long-term lessee has a degree of flexibility unavailable to the purchaser. IBM's senior vice president testified that, at least with some models, the decision to purchase or lease may not be affected by price changes. On this record a jury could infer that the need for flexibility governed the choice between a lease and purchase, and that there was substantial customer resistance to shifting from one to the other.[13]

The computer industry, as well as its customers, recognized the distinction between the business of selling and the business of leasing. Leasing companies, of course, engaged only in the latter. Moreover, leasing requires a commitment of capital for a substantially greater period of time than selling.

IBM argues that both leasing and buying are merely methods of financing the use of computer systems. However, the Sherman Act cannot be avoided by classifying the commercial activity involved as financing. A difference in services offered by financial institutions may provide the basis for recognition of distinct submarkets for antitrust purposes.[14]

We conclude that the evidence was sufficient, though by no great margin, to permit the jury to find that the differences between leasing and selling general purpose computers were of sufficient significance to justify treatment of the two forms of distribution as distinct submarkets for competitive purposes.

In light of this conclusion we need not decide whether IBM's product line constitutes a separate submarket for antitrust purposes.[15] Greyhound offered evidence that although other manufacturers compete with IBM for initial installation, the cost of changing to another manufacturer's system once a system is installed may be prohibitive.[16] Greyhound asserts that by offering a complete product line of general purpose commercial systems, IBM is able to "lock

12. The following testimony is illustrative. An industry analyst testified, "If the man at General Motors is putting in a control system in an assembly area, he will buy that. If he's putting in a computer to run the payroll, to keep sales analysis he will probably lease that." Asked whether this difference was related to flexibility, he responded, "Yes, because his production control system will be dedicated to assembling automobiles, which is a relatively fixed task." The data processing manager of one company testified that his organization had both purchased and leased computers, and that it had elected to lease an IBM 360/30 at the same time that it purchased a large machine because it desired the flexibility of the lease and did not wish to assume the risk of owning a machine it might outgrow.

13. The fact that some leases contained a purchase option permitting the lessee to obtain title to the equipment at some point after expiration of the contract term does not undermine the distinction between leasing and purchasing. The customer's need for flexibility still dictates the initial decision to lease, and the purchase option may prove to be a desirable alternative should the user's data processing needs stabilize at some point in the future.

14. IBM argues that in any event Greyhound's proof relates to the wrong market. It claims that Greyhound's charge is that IBM manipulated the price at which computers are sold, not leased, and if the two submarkets differ, the relevant market is not the lease market but the purchase market. We deal with this contention below, when we consider IBM's general defenses. See 559 F.2d p. 502, infra.

15. We also do not reach Greyhound's contention that "risk leasing" constitutes a submarket distinct from "full-payout" leasing.

"Full-payout" leasing is self-defining. "Risk leasing" was described as "the business of purchasing equipment, in this case, computer equipment, putting it out on rent to a user under a contract, which does not pay for the total cost of the equipment, thus requiring us to move the equipment from one user to another user, and so forth, hopefully to a sufficient number of users at sufficiently high rent to pay for the equipment and result in a profit."

16. One customer testified: "[T]o replace the IBM equipment with some other manufacturer's equipment now would mean literally scrapping of maybe a million dollars worth of programming and systems engineering." A leasing company executive testified that when one of his IBM computers came off lease, he did not compete with non-IBM manufacturers in releasing the equipment: "Well, we only compete with the same kind of equipment, whether it be owned by IBM, or another company. We do not compete between types of equipment. The economics are just not practical."

in" users who select IBM equipment initially, and limit competition to leasing companies carrying IBM systems. We intimate no view on whether such evidence establishes an economically distinct submarket. *Compare Bushie v. Stenocord Corp.*, 460 F.2d 116, 120–21 (9th Cir. 1972); *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344 (9th Cir. 1970).

### B. *Possession of Monopoly Power*

There was evidence from which the jury could reasonably infer that IBM possessed monopoly power in the leasing of general purpose commercial computers.

 "Monopoly power is the power to control prices or exclude competition."

*United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). *Accord, United States v. Grinnell Corp., supra*, 384 U.S. at 571, 86 S.Ct. 1698. "[S]ize is of course an earmark of monopoly power," *United States v. Griffith*, 334 U.S. 100, 107 n. 10, 68 S.Ct. 941, 946, 92 L.Ed. 1236 (1948), and "[t]he existence of such power ordinarily may be inferred from the predominant share of the market." *United States v. Grinnell Corp., supra*, 384 U.S. at 571, 86 S.Ct. at 1704. The evidence in this record permitted a calculation [17] of IBM's share of revenues from leasing of general purpose computers at 82.5 percent in 1964, 75.1 percent in 1967, and 64.68 percent in 1970.[18] The portion of

**17.** This calculation is based on the following steps. Greyhound's Exhibit 633 shows the total leasing revenue earned by the eight major manufacturers in the general purpose commercial market for the years 1964, 1967, and 1970, and IBM's percentage of these totals. Greyhound's Exhibit 630 shows the leasing revenue earned by leasing companies during the same years. Addition of the figures in the two exhibits gives an approximation of the total lease revenue earned from general purpose commercial systems. IBM's portion of this total is 82.5% in 1964, 75.1% in 1967, and 64.7% in 1970.

Lease revenue earned by peripheral manufacturers and systems manufacturers other than the eight major manufacturers is not included in the total from which IBM's share was figured. However, Greyhound's Exhibit 625 indicates that peripheral companies account for a maximum of 1.3% of the total lease revenues for all computer systems and that in recent years systems manufacturers other than the major eight account for only about .5% of this total. Consequently, the jury could ignore as insubstantial whatever share of the general purpose commercial market these companies held.

IBM quibbles with the figures in Greyhound's exhibits, but the jury could conclude they were essentially accurate.

It is unclear from the record whether banks and finance companies also derive revenue from the leasing of general purpose commercial systems that should be included in the total against which IBM's share is measured. Because Greyhound is entitled to have every reasonable inference drawn in its favor, we have excluded banks and finance companies from the group of competitors in the relevant market. IBM makes a passing reference to competition from foreign manufacturers, but the evidence showed only that Japanese manufactur-

ers hoped to enter the market at some time in the future.

**18.** In *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), the Supreme Court held that an 87% market share "leaves no doubt that . . . these defendants have monopoly power." In *American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946), the Court stated that "over two-thirds of the entire domestic field of cigarettes, and . . . over 80% of the field of comparable cigarettes" constituted "a substantial monopoly." This court has found monopoly power where the defendant's market position was less dominant. *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) (45–70%); *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 452, 458 (9th Cir. 1966), *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) (67 or 70%). But cf. *United States v. International Harvester Co.*, 274 U.S. 693, 709, 47 S.Ct. 748, 71 L.Ed. 1302 (1927) (64.1% not sufficient in increasingly competitive market); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) ("it is doubtful whether sixty or sixty-four percent would be enough"). We have expressed doubt that a 50% share of the market is sufficient to establish monopoly power per se. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975).

The record indicates that IBM's market share is declining. A declining market share may reflect an absence of market power, *see United States v. International Harvester. Co., supra*, 274 U.S. at 709, 47 S.Ct. 748; *United States v. United States Steel Corp.*, 251 U.S. 417, 439 n.1, 40 S.Ct. 293, 64 L.Ed. 343 (1920), but it does not foreclose a finding of such power. *See American Tobacco Co. v. United States, supra*, 328 U.S. at 794–95, 66 S.Ct. 1125.

the market not controlled by IBM was dispersed among many other companies, none accounting for more than 4 percent of total lease revenues. Eight firms manufactured over 95 percent of the general purpose computers,[19] and IBM's share of the general purpose commercial lease revenues of this group of the strongest competitors in the relevant market was 83.7 percent in 1964, 78.9 percent in 1967, and 77.7 percent in 1970. The revenue of each of the other seven was relatively insubstantial.

Evidence other than IBM's predominant share of the market supported an inference of market dominance. About 80 percent in dollar value of the installed base of general purpose systems is IBM equipment. IBM derived substantial market leverage from the fact that the vast majority of installed computer systems are IBM built. There was evidence that because of the high changeover costs faced by customers who wish to change equipment manufacturers, the rental demand for IBM systems among current IBM users was inflexible. IBM's senior vice president testified that rental prices of some models could be increased without proportionate decreases in demand. Other evidence indicating IBM's ability to manage its prices with little regard to competition included testimony that IBM based its prices on a 30 percent profit objective, that it never set a price simply to meet competition, and that its prices were 5 to 15 percent above those of the best of its competition.

IBM responds that other evidence in the record indicates IBM did not possess monopoly power. None of this evidence compelled a ruling in IBM's favor as a matter of law. IBM argues, for example, that the "youth, change and growth" of the computer industry are inconsistent with a finding

of monopoly power. These characteristics, however, do not immunize an industry from monopolization, and, in any event, nothing in the record suggests that IBM's own power was transient. IBM also argues that entry into the industry is easy, and that IBM's competitors are strong and independent. But the record suggests new entrants avoided direct confrontation with IBM and occupied interstices in the market. Two substantial competitors who met IBM directly in the marketplace (RCA and General Electric) bowed out after sustaining heavy losses. The record also suggests that IBM's dominant installed base and high changeover costs have created a barrier to entry at the manufacturing level so substantial that only leasing companies will be able to initiate competition with IBM for this large group of users.[20]

IBM also contends that price reduction and product improvement are characteristics of the industry and are inconsistent with the existence of monopoly power. But rapid technological progress may provide a climate favorable to increased concentration of market power rather than the opposite.[21] Moreover, a decline in prices does not necessarily imply an absence of monopoly power; a fair profit might have been made at even lower cost to users. *See United States v. Aluminum Company of America*, 148 F.2d 416, 427 (2d Cir. 1945). Finally, IBM asserts that because of competition from other companies its revenue fell $220 million from 1968 to 1969 and $150 million from 1969 to 1970. But IBM offered quite a different explanation to its shareholders, informing them that the decline was the result of cyclical purchases and an adverse economy.

**19.** These eight manufacturers were IBM, Burroughs, Control Data, General Electric, Honeywell, NCR, RCA, and Sperry Rand (Univac). RCA's computer business was later acquired by Sperry Rand; Honeywell acquired the General Electric computer business.

**20.** This evidence suggests one answer to IBM's argument that monopolization is precluded by the fact that most users of computers are them-

selves strong, sophisticated business organizations "able to evaluate and switch to competitive products."

**21.** *See* Halverson, *The Relationship of Antitrust Policy and Technological Progress*, 1975 Wash. U.L.Q. 409, 413–20; note, *Innovation Competition: Beyond Telex v. IBM*, 28 Stan.L.Rev. 285, 289 n.14 (1976).

## C. *Willful Acquisition or Maintenance of Monopoly Power*

The gravamen of Greyhound's complaint is that IBM undertook to advance IBM's own leasing operations at the expense of leasing companies by making the purchase of computer equipment for lease economically unattractive.[22]

There was ample evidence that IBM officials became concerned that the balance between sales and rental had turned too heavily toward sales, and deliberately set about to reverse the trend. Greyhound asserts that in pursuit of this goal IBM adopted certain practices that reflect "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., supra*, 384 U.S. at 570–71, 86 S.Ct. at 1704.

These practices were (1) inaugurating the "fixed term plan," (2) eliminating the technological discount, (3) increasing the "multiplier" (a ratio describing the relationship of IBM purchase price to IBM rental price), and (4) "unbundling" (*i. e.*, pricing services separately from the equipment purchase price).

■ It is no answer to the charge to say that these practices are not "predatory"[23] but "honestly industrial"[24]—that is, of a kind an ordinary enterprise might utilize with impunity. If the jury concluded IBM possessed monopoly power in the leasing of general purpose computers, IBM would be precluded from employing otherwise lawful practices that unnecessarily excluded competition from the submarket.[25] The question is whether the jury could have found that the alleged practices were in fact adopted, and, if so, whether they had the prohibited effect. IBM's position is that Greyhound failed to show any manipulation of the multiplier or technological discount, and that "unbundling" and the fixed term plan were not exclusionary but pro-competitive.

### 1. *The Fixed Term Plan*

■ IBM had leased mainframe equipment for 90 days and peripheral equipment for 30 days. In May 1971 IBM announced the "fixed term plan," offering an 8 percent reduction on some peripheral equipment for a one-year lease, and a 16 percent reduction for a two-year lease. The plan also eliminated extra shift and maintenance charges. Substantial penalties were imposed for premature lease cancellation. The purchase price of the equipment was also reduced 15 percent, and purchasers were given a 12 percent technological discount per year for up to two years. At the same time IBM increased rental rates for mainframe equipment.

Greyhound contends that the fixed term plan locked customers into IBM's rental base and made price competition more difficult. But the record shows that leasing companies had traditionally priced peripheral equipment lower than IBM and offered lease terms of from one to seven years. Greyhound failed to show that IBM's action with respect to peripheral equipment was

---

**22.** Leasing was more advantageous to IBM than selling the same equipment. Leasing avoided the bunching of revenues and profits during heavy sales periods (usually the first years after introduction of a new product), and thereby helped maintain a constant revenue flow. It also generated particularly attractive profits after the equipment was fully depreciated. Moreover, it facilitated introduction of newly developed products, since lessees were not inhibited by a large investment in either the new or the old machine.

**23.** *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 497–98, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

**24.** *American Tobacco Co. v. United States*, 328 U.S. 781, 814, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), *quoting United States v. Aluminum Co. of America*, 148 F.2d 416, 431 (2d Cir. 1945). *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 496, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

**25.** *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 344–45 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). *See also Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344–45 (9th Cir. 1970).

anything more than a reasonable response to this competition.

Greyhound can hardly complain of IBM's increase in its rental rates for mainframe equipment, since this change could only work to the advantage of leasing companies.

## 2. Technological Discount

■ Although electronic data processing equipment is virtually indestructible, it is nonetheless subject to obsolescence as new technology replaces the old. In recognition of this fact IBM grants a "technological discount" on the purchase price of used equipment. Greyhound alleges that IBM manipulated the technological discount in such a way as to restrict competition from leasing companies.

Until late 1963 IBM's technological discount on second generation equipment was 10 percent per year, up to a maximum of 75 percent. Thus, equipment on the market for several years could be purchased at 25 percent of original cost. Leasing companies made extensive use of the second generation discount. IBM's Management Review Committee observed in 1965 that one reason for the rapid growth of leasing companies was their ability to purchase equipment at substantial discounts and return a profit in a short period of time.

In 1963 IBM reduced the annual discount from 10 to 5 percent per year and the cumulative maximum from 75 to 35 percent. In 1964, shortly after the announcement of System 360, the discount was changed to 12 percent after the first year with no further discounts in succeeding years. Thus, the lowest price at which a purchaser could obtain a third generation IBM computer was 88 percent of the original price.

These changes restricted the capacity of leasing companies to compete by inhibiting purchases late in the product cycle. Because reduction of the discount increased the price leasing companies had to pay for their equipment, growth of their inventory was curtailed. Confining the discount to the first year of use required the leasing companies to bunch their purchases in the early years of a product cycle, eliminating the previously profitable practice of acquiring equipment late in its useful life at a relative low and quickly recoverable cost.[26]

There was evidence from which the jury could infer that these anticompetitive consequences were intended. IBM's vice president for finance and planning acknowledged that the alter technological discount on the 360 would reduce purchases. The Management Review Committee's comment in 1965, after the change in the discount schedule, that leasing companies had prospered under the former policy supports an inference that the change was aimed at harming these competitors. IBM's director of finance noted in 1969 that although a declining purchase price "makes economic sense," that policy had been rejected in order to create a "potential negative impact on leasing companies through a devaluation of their inventory."

**26.** Most of Greyhound's 360 purchases occurred in the first and second years after large-scale delivery of the system began. Greyhound's purchases totaled $171 million—about $20 million in 1966, $55 million in 1967, $75 million in 1968, $15 million in 1969, and less than $5 million in 1970 and 1971 together. Greyhound's president testified that the decline was due to IBM's failure to provide additional technological discounts later in the product cycle, and that Greyhound would have purchased 360 equipment in subsequent years had the discount been similar to that offered on second generation equipment. Another leasing company executive also attributed the decline in purchase of 360 equipment to IBM's change in the technological discount. This testimony is supported by Greyhound's experience with second generation equipment. Greyhound invested profitably in used second generation equipment late in the product cycle when a large discount was available, but lost money on late purchases of second generation equipment when no discount was available.

Randolph Computer, another leasing company, invested a total of $175 million in System 360, $159 million of the total prior to 1969. Like Greyhound, Randolph Computer reduced its 360 purchases after 1968 because the technological discount was not sufficiently large to justify later purchases.

■ IBM contends that Greyhound carries IBM equipment on its books at a value higher than the equipment would be worth under the technological discount available prior to late 1963, implying that Greyhound's accounting proves IBM's original discount rate did not reflect economic realities. However, Greyhound depreciated IBM equipment at the rate of 10 percent per year from the date of purchase, and IBM itself depreciated the equipment over a six-year period. Even if the jury were to find the original discount rate excessive, it could still conclude that the reduction to a total of 12 percent was not economically justifiable.[27]

### 3. *Multipliers and Maintenance Rates*

■ The "multiplier"—a ratio describing the relationship between IBM's sales price and IBM's monthly rental charge—reflects both the cost of the equipment to the leasing company and the rental charge with which the leasing company must be competitive. As the multiplier increases, the number of rental months necessary to recover the cost of the equipment also increases, and investment in the system becomes less profitable. Greyhound's president testified that the multiplier "dictates whether we can do business or whether we can't do business, whether our company is viable and whether it isn't viable." Even a modest change in the multiplier can have a significant effect upon the ability of leasing companies to compete.

Greyhound contends that beginning with new models of System 360 announced in 1968 (Model 25 and System 3), and continuing through System 370, IBM increased the multiplier substantially, and the effect of this increase was to limit competition from leasing companies.

IBM insists no such increase occurred, and that Greyhound's contrary assertion is "a flat misstatement of the record." The record is replete with calculations reaching apparently inconsistent results. The conflict appears to result primarily from the fact that the disputants are referring to different things.

The "gross" multiplier is IBM's sales price divided by IBM's monthly rental charge. However, because IBM's rental charge included the cost of maintenance and leasing companies do not provide maintenance leasing company rates must be competitive with IBM's rental charge minus IBM's monthly maintenance rate.[28] This ratio of IBM's sales price to IBM's rental charge minus the maintenance rate is called the "net" or "effective" multiplier. The multiplier of concern to leasing companies includes one additional adjustment. The IBM sales price must be reduced by the amount of the technological discount or investment tax credit.[29] IBM's failure to take this step into account in calculating the multiplier on System 360 computers explains much of the confusion at trial.

Greyhound's figures are derived by dividing IBM's sales price minus the applicable discount or credit by IBM's rental charge minus the maintenance rate. From the evidence presented at trial the jury could have found that IBM did increase this multiplier. Evidence indicated that when Greyhound purchased its System 360 equipment, the average multiplier, considering all dis-

**27.** IBM points to the fact that IBM eliminated late cycle discounts before Greyhound Computer Corporation, Inc., was formed. This does not preclude Greyhound Computer's objection to the practice, however, since Greyhound Computer is the successor of Greyhound Leasing & Financial, which traces its entry into the computer leasing industry to 1962, at least a year before IBM first altered its discount policy.

It is also true that Greyhound admitted the initial 12% discount assisted early purchases, but this fact does not detract from Greyhound's complaint that IBM's refusal to account for additional obsolescence after the first year of use was destructive of competition.

**28.** IBM's rental charge included maintenance, but its sales price did not.

**29.** There was evidence that Greyhound would not purchase equipment unless either the investment tax credit or the technological discount was available. Either credit had the effect of reducing the purchase price of IBM equipment by about 12%.

counts, was 42.5 to 1. But when IBM offered 370 equipment for sale, the multiplier had been increased to 48 to 1.[30]

Moreover, the increase was accomplished at least in part by means inconsistent with the competitive model. There was evidence that instead of lowering rental rates, an action consistent with competitive behavior, IBM increased its maintenance charges despite decreased maintenance costs. Each succeeding generation of IBM equipment was more reliable and hence less costly to maintain. Maintenance costs on 360 computers, for example, were less than those on second generation computers. Although 370 computers represented another marked advance in reliability, IBM raised its maintenance rates on this equipment.[31]

There was evidence from which the jury could conclude that the effect of the increase in the multiplier was to restrict leasing company access to 370 equipment severely. If leasing companies elected to purchase System 370 equipment, they would have to persuade their customers to enter into seven-or eight-year leases, which most users would reject as unreasonably long. Several witnesses testified that the new multiplier effectively foreclosed leasing company purchases of IBM's 370 equipment and thus from participation in the business of leasing such equipment in competition with IBM.[32]

30. An IBM "Leasing Company Variance Analysis" assumed 1966 multipliers to be 42 to 1, and those of 1970 to be 48 to 1. Another 1970 IBM report recognized an increase in the net multiplier, absent discounts, from about 45, to 56. Other IBM documents reflected the company's awareness that System 370 was ushering in "higher purchase multipliers and a general increase in maintenance prices." A report of a field survey by an independent expert also acknowledged the increase in multipliers on System 370.

IBM argues that if the investment tax credit or technological discount were applied to the 370 multipliers, the adjusted multiplier would be about 42 to 1. But the record shows that these discounts were included in Greyhound's calculation of the multiplier on System 370 at 48 to 1.

IBM argues that the multipliers on sales of 360 equipment shown in Exhibit H–2 are approximately the same as the multipliers on sales of 370 equipment shown in Exhibit G–2. However, all the purchases reflected in Exhibit H–2 occurred prior to IBM's "three by three" price adjustment on Oct. 1, 1966, which had the effect of reducing the effective multipliers. Since Greyhound purchased 88 to 92% of its 360 equipment after this adjustment, the multipliers reflected in Exhibit H–2 are not representative of those generally applicable to Greyhound.

There was testimony that the multiplier on 360 Model 25 was increased to about the level of the multiplier on 370 equipment, and that the multiplier on System 3 was raised to 46.7.

31. The monthly maintenance charge on System 360 equipment was 8% of the monthly rental. The maintenance charge on System 370 equipment was up to 13% of the monthly rental. Multiplier increases on the 360 Model 25 and the System 3 were also attributable to higher maintenance charges.

32. IBM contends that leasing companies purchased System 370 to the same extent they purchased System 360 over a comparable period of time. The record suggests otherwise. The jury could have concluded that demand for different computer generations should be compared as of the time volume deliveries of each system began, and since System 370 appeared on the market in quantity about a year earlier than System 360 in their respective product cycles, the proper comparison was between demand for the 360 system in 1967 and demand for the 370 system in 1972. Leasing company purchases of System 360 equipment totaled $550 million in 1967, but an industry analyst estimated that leasing companies would purchase only $50–$75 million of System 370 equipment in 1972.

IBM argues that the Greyhound interests are in fact buying and leasing System 370 equipment through Greyhound Leasing & Financial, another subsidiary of the parent Greyhound Corporation, and that such activity undermines Greyhound Computer's claim that purchase of 370 equipment for lease is not economical. But the record shows that Greyhound Leasing had invested only about $2 million in 370 equipment at the time of trial, a fraction of the investment Greyhound Computer had made in 360 equipment at a comparable point in the product cycle.

IBM also argues that Greyhound Computer has arranged to sublet equipment owned by Greyhound Leasing and that this arrangement will be pursued in the marketing of 370 equipment. However, IBM introduced evidence of only two such subleasing transactions, and neither involved 370 equipment. A greyhound witness testified that the transactions were ad hoc arrangements that occurred infrequently.

IBM says that a former Greyhound president admitted leasing companies could profitably purchase and lease 370 equipment. But the

### 4. "Unbundling" of Services

Prior to June 1969 IBM provided certain services to IBM customers without additional charge, including education of customer personnel, software support, technical guidance in the use and application of the equipment, and advice on physical installation. The cost of these services was included or "bundled" in IBM's rental charge. IBM provided equivalent services to the first users of purchased computers, including leasing company lessees. A Greyhound witness testified that the cost of these services represented about 15 percent of the purchase price.

In June 1969 IBM announced it would no longer provide services to IBM rental customers or to first users of purchased equipment except upon payment of an additional charge. At the same time, IBM reduced its rental charges and purchase prices by 3 percent.

Since IBM did not compensate purchasers for the withdrawal of services, leasing companies that had IBM computers still placed with first users were deprived of services for which they had already paid. In effect, IBM raised the multiplier after the leasing companies had purchased the equipment. Leasing companies were burdened with an inflated investment in equipment already bought and at the same time were compelled to meet reduced IBM rental rates in the leasing market.

In addition, IBM recognized that since the purchaser pays for services at once while the rental customer pays over a period of time, the purchase price should be cut by more than the rental price in order to show an even reflection of the cost of services. However, IBM did not make the purchase price reduction because, as one IBM document stated, it hoped to "protect the level of purchase multipliers to the maximum extent possible." The jury could thus

have concluded that IBM's method of unbundling effectively raised multipliers on future purchases as well.[33]

IBM claims that its decision to charge separately for services was pro-competitive because "it opened the door wider to actual and potential suppliers of the same or similar services." It may have been pro-competitive to charge separately for services and equipment, but it was anticompetitive to do so in a way that left the leasing companies with an inflated investment and lowered returns.

### 5. General Defenses

IBM argues that its market power rests upon superior technology and business acuity. As the discussion has suggested, however, on the evidence thus far presented at trial the jury could have concluded that IBM maintained its monopoly power in the leasing of general purpose computers in part by practices that unnecessarily, even deliberately, excluded leasing companies from an opportunity to compete. Judge Wyzanski's characterization of the leasing practice involved in *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 344–45 (D.Mass.1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), is equally applicable to IBM's practices with respect to the technological discount, the multiplier, and the "unbundling" of services:

. . . [T]hey are not practices which can be properly described as the inevitable consequences of ability, natural forces, or law. They represent something more than the use of accessible resources, the process of invention and innovation, and the employment of those techniques of employment, financing, production, and distribution, which a competitive society must foster. They are contracts, arrangements, and policies which, instead of encouraging competition based on pure

---

testimony in question, concerned Models 25 and 85 of System 360, not System 370, and was based on a set of assumptions termed unrealistic by the witness.

**33.** IBM asserts that Greyhound attempted to raise its rates after "unbundling" and argues that this conduct was inconsistent with Greyhound's present claim, but the evidence indicates that Greyhound was unable to obtain the increased rates.

merit, further the dominance of a particular firm. In this sense, they are unnatural barriers; they unnecessarily exclude actual and potential competition; they restrict a free market.

IBM offers a second general defense. As we have said, Greyhound complains that the challenged practices made it more difficult for leasing companies to purchase IBM's general purpose computers. IBM points out that Greyhound did not establish IBM had monopoly power in the market for purchase and sale of general purpose computers as distinguished from the market for leasing such equipment. IBM argues that this omission is fatal to Greyhound's case.

 Failure to establish that IBM had monopoly power in the sales market is not a legal bar to holding that IBM violated the Act by using exclusionary sales tactics to maintain its monopoly power in the lease market. The Sherman Act would be violated if IBM had monopoly power in the sales market and used that power to foreclose competition, gain a competitive advantage, or destroy a competitor in the lease market. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). But a concern with monopoly power in a relevant market also violates section 2 if it willfully maintains that power. *See, e. g., United States v. Grinnell Corp., supra,*

384 U.S. at 570–71, 86 S.Ct. 1698. Thus, Greyhound has established a prima facie violation of the Act by showing that IBM employed exclusionary tactics to maintain an existing monopoly in the lease market. *United States v. United Shoe Machinery Corp., supra,* 110 F.Supp. at 343. *See Industrial Building Materials, Inc. v. Interchemical Corp., supra,* 437 F.2d at 1344–45.[34]

Perhaps IBM intends to make a factual argument rather than a legal one—that absent monopoly power in the sales market, IBM could not in fact have fixed the terms and conditions upon which the equipment was sold, as Greyhound asserts, since Greyhound and other leasing companies could simply have turned to another seller to obtain their equipment.

 Greyhound offered direct evidence to prove that the conduct complained of did occur and that it restricted the competition of leasing companies in the leasing market, in which IBM possessed monopoly power. This was sufficient to establish a prima facie case. Greyhound was not required to prove the source of IBM's power to do what Greyhound's evidence indicated IBM in fact did. Greyhound's failure to prove that IBM possessed monopoly power in the sales market may have affected the weight of Greyhound's evidence, but did not render it insufficient to support a verdict.[35]

---

**34.** A prima facie case, as we use the term, is the quantum of proof that will permit the non-movant to survive a motion for a directed verdict. *See, e. g., White v. Abrams,* 495 F.2d 724, 729 (9th Cir. 1974); *Archibald v. Pan American World Airways, Inc.,* 460 F.2d 14, 17 (9th Cir. 1972). In determining whether the evidence meets this standard, we are required to draw all reasonable inferences from the evidence in the non-movant's favor. *See* note 2 *supra* and accompanying text. A trier of fact might well draw contrary inferences from the evidence. Moreover, IBM has not yet presented its case and IBM's evidence may demonstrate that the inferences we draw from the present record are not tenable.

**35.** Although Greyhound did not attempt to demonstrate that IBM possessed monopoly power in the sales market, the evidence shows that IBM possessed considerable power with respect to leasing companies in this market.

The record indicates that leasing companies dealt almost exclusively in IBM equipment. Because of IBM's dominant installed base of rental customers and the high changeover costs involved in switching to computers manufactured by another company, *see* note 16 *supra,* leasing companies depended upon the availability of IBM systems to deal with the large segment of the market represented by current IBM users. One leasing company executive testified he had considerable difficulty leasing non-IBM systems because the market for such equipment was "pretty thin." Moreover, there was testimony that leasing companies could not readily obtain financing to purchase computers other than those manufactured by IBM. This evidence suggests that leasing companies could not shift easily to equipment manufactured by others when IBM altered the terms and conditions of sale adversely to buyers.

III. *Attempt to Monopolize*

IBM argues that the attempt to monopolize charge was properly taken from the jury because Greyhound failed to offer sufficient proof on any of the following issues: (1) "an appropriate relevant market in which IBM could have attempted to monopolize," (2) "a dangerous probability" of monopolization, (3) "the required specific intent," and (4) "that any action by IBM was predatory in nature."

We have held the evidence sufficient to permit the jury to find that IBM monopolized the submarket for the leasing of general purpose commercial computers. Nonetheless, we assume for the purpose of evaluating Greyhound's claim of attempt to monopolize that we are in error as to the first two issues and that the record would not support a jury finding of even a dangerous probability of monopolization of an appropriate market.

On this premise, Greyhound would still be entitled to go to the jury on the charge of attempt to monopolize if there were sufficient proof on the third and fourth issues. A prima facie case of attempt to monopolize is made out by evidence of a specific intent to monopolize "any part" of commerce, plus anticompetitive conduct directed to the accomplishment of that unlawful purpose. *Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 813–14 (9th Cir. 1976); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1276 (9th Cir. 1975); *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1051–52 (9th Cir. 1974); *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.*, 498 F.2d 1137, 1144–45 (9th Cir. 1974); *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 11–13 (9th Cir. 1973); *Moore v. Jas. H. Matthews & Co.*, 473 F.2d 328, 332 (9th Cir. 1973); *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344 (9th Cir. 1970); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474–75 (9th Cir. 1964).[36]

If proof of an economic market, technically defined, and proof of a dangerous probability of monopolization of such a market were made essential elements of an attempt to monopolize, as a practical matter the attempt offense would cease to have independent significance. A single firm that did not control something close to 50 percent of the entire market, *see Twin City Sportservice, Inc. v. Charles O. Finley & Co., supra*, 512 F.2d at 1274, would be free to indulge in any activity however unreasonable, predatory, destructive of competition and without legitimate business justification. Any concern not dangerously close to monopoly power could deliberately destroy its competitors with impunity. These are not abstract hypotheses. A market share approaching monopoly is not required to enable one concern seriously to impede the capacity of others to compete by use of abusive trade practices. A construction of the Sherman Act that would immunize such practices would be contrary to the purposes of the Act; it is not required by the Act's language or legislative history.[37]

---

**36.** *Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825, 832 (9th Cir. 1971), and *Bushie v. Stenocord Corp.*, 460 F.2d 116, 121 (9th Cir. 1972), must be read consistently with this position. *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 12 & n.3 (9th Cir. 1973). *See also Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 814 (9th Cir. 1976); *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), cited by IBM, is not in point. The Supreme Court limited its inquiry in that case to monopolization; the Court did not review the attempt claim. *Id.* at 784, 66 S.Ct. 1125. *See* 324 U.S. 836, 65 S.Ct. 864, 89 L.Ed. 1400 (1945) (granting certiorari).

**37.** The Sherman Act is "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). "It is designed to sweep away all appreciable obstructions so that the statutory policy of free trade might be effectively achieved." *United States v. Yellow Cab Co.*, 332 U.S. 218, 226, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010 (1947). While § 1 prohibits unreasonable restraints of trade, § 2 makes "the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade

■ In the present case the jury could have inferred a specific intent to exclude leasing companies from competition from such evidence as expressions of concern by IBM officials over growing leasing company competition and repeated references by such officials to the goal of limiting sales of IBM equipment and increasing IBM's lease base, and from the way IBM sought to accomplish this goal. Eliminating the technological discount late in the product cycle despite the reality of technological obsolescence, increasing the multiplier by raising maintenance charges in the face of a reduction in maintenance costs, and separating service charges in a way that inflated leasing company investment while reducing their rental income, appear, prima facie, to be anticompetitive activities that impaired competition without a legitimate business purpose.

Greyhound introduced sufficient evidence to carry the attempt to monopolize claim to the jury.

## IV. Damages

■ Greyhound met its burden of introducing sufficient evidence to permit the jury to infer that Greyhound had sustained damage and that IBM had caused it.[38] There was testimony that Greyhound was unable to supplement its inventory with late cycle 360 equipment because of IBM's reduction of the technological discount, and that Greyhound was virtually foreclosed from purchasing System 370 equipment because IBM raised the multiplier.

An IBM internal memorandum prepared when System 370 was announced supports Greyhound's contention that IBM is the primary source of Greyhound's problems. The memorandum summarizes a series of calculations based upon projected multiplier increases consistent with those shown at trial and concludes "the economy will harm the leasing company by an additional 11%." IBM characterizes the document as meaningless and "wholly speculative," and urges that it be disregarded. But a jury could infer that the "IBM actions" referred to were the increases in the multiplier and maintenance rates that in fact occurred, and that the writer believed these practices would have the effect of harming leasing companies nearly twice as much as market factors not in IBM's control.

■ IBM argues that "[p]erhaps Greyhound Computer is not buying 370 now because . . . it cannot take advantage of the 13% price reduction which is the effect of the investment tax credit." As the very phrasing suggests, IBM's argument presents a question for the jury. Greyhound's evidence indicates that the benefit of the tax credit was deferred rather than lost. Moreover, given full credence, IBM's contention does not detract from evidence showing that multipliers on the 370 are considerably higher than those on the 360.

IBM suggests that Greyhound may have been unable to purchase 370 equipment because the system had not been on the market long enough to make the technological

. . . ." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 211, 79 S.Ct. 705, 708, 3 L.Ed.2d 741 (1959), *quoting Standard Oil Co. v. United States*, 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See also United States v. Griffith*, 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

More specifically, there is support in the decisions and legislative history for the conclusion that § 2 was intended to prohibit unreasonable restraints of trade that exclude competition even when they are imposed by a single trader. Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophlactic Riddle of Section Two*, 72 Mich.L.Rev. 373, 424–32 (1974). *See also* Note, *Attempt to Monopolize under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case*, 73 Colum.L.Rev. 1451, 1452–59

(1973); Note, *Prosecutions for Attempts to Monopolize: The Relevance of the Relevant Market*, 42 N.Y.U.L.Rev. 110, 115–16 (1967); Note, *Attempt to Monopolize: The Offense Redefined*, 1969 Utah L.Rev. 704, 709, 711. Such a view is sound in practice since conduct indicative of a specific intent to monopolize generally has no social or economic justification. Turner, *Antitrust Policy and the Cellophane Case*, 70 Harv.L.Rev. 281, 305 (1954).

**38.** *See Zenith Corp. v. Hazeltine*, 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 700, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957).

discount available. But a Greyhound witness testified that because of the increased multiplier, 370 equipment would not be a reasonable investment for leasing even with the discount. It was the jury's function to choose between the conflicting inferences.

For these reasons we reject IBM's contention that the evidence was insufficient to permit a jury finding of injury and causation. IBM also insists, however, that Greyhound "only speculates about how much it might have been damaged by any acts of IBM."

All that is required of the victim of an antitrust violation is evidence showing "the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).[39] This standard was satisfied here.

A forecast prepared by Greyhound estimated the company could earn $12 million more in after-tax profit between 1971 and 1975 if it could purchase 370 computers on terms as favorable as those available on the 360. IBM points to testimony of Greyhound's president that the report was "meaningless." But the witness's apparent meaning was only that the accuracy of the report as a forecast had been destroyed by changes in IBM's pricing practices.

Other evidence in the record would permit the jury to estimate the amount of Greyhound's damages by applying Greyhound's profit rate on past business to the volume of business assertedly lost as a result of IBM's conduct. IBM argues that Greyhound's profit rate cannot be determined and, in any event, that Greyhound failed to show any similarity between its past business and the future business from which it was excluded.

IBM contends that past profits can only be calculated when the economic life of the particular equipment has ended. Although the purchase price of the equipment is known, IBM argues that the economic life over which it must be amortized is not, and that there is no agreement as to the proper depreciation rates. Further, IBM asserts, both future rental income and future expenses are unknown and highly speculative.

■ If IBM's argument were accepted, antitrust damage actions would have only limited and fortuitous application in any business involving long-term capital investment. Whether such a venture will be profitable, and, if so, what the profits will be, is necessarily uncertain until the investment has been fully amortized. The risk that error will occur in resolving this kind of uncertainty must be borne by the antitrust violator where wrongdoing intervenes before the process is complete. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Co., supra*, 282 U.S. at 563, 51 S.Ct. 248; *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

Greyhound had an established business and the future profits could be shown by past experience. *Eastman Kodak Co. v. Southern Photo Materials Co., supra*, 273 U.S. at 379, 47 S.Ct. 400. The only condition to a calculation of damages on this basis is that "the market conditions in the two periods were similar but for the impact of the violation." *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1207 (9th Cir. 1975). As we have seen, Greyhound sought to prove loss of business and consequent damage from two basic courses of conduct: IBM's failure to grant late cycle discounts on System 360 equipment, and IBM's manipulation of the multiplier and service charges on System 370 equipment.

It is true that at the time of trial Greyhound's 360 equipment was still on lease with much of its value not yet depreciated, and that 370 equipment was still new on the market. However, the record afforded a reasonable basis for estimating the economic life of both systems and the loss of profits resulting from IBM's interference

**39.** *Accord, Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Eastman Kodak Co. v. Southern*

*Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Knutson v. The Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976).

with Greyhound's participation in the distribution of both.

Three "generations" of IBM computers are involved in the computation—the second generation introduced in 1958, the third (System 360) in 1964, and the so-called fourth (System 370) in 1970. Greyhound's profit experience with second generation equipment provides a reasonable basis for computation of damages resulting from Greyhound's exclusion from late cycle leasing of 360 equipment, and Greyhound's profit experience in leasing 360 equipment serves as an appropriate basis for measuring Greyhound's loss resulting from its exclusion from leasing 370 equipment.

There was ample evidence that the economic life span of each of these generations of equipment was about 10 years. The jury could reasonably assume that a straight-line depreciation policy of 10 percent per year was proper, and testimony supported the view that a 10 percent residual value was reasonable. Greyhound's profit calculations were made on the basis of these assumptions.

Greyhound began purchasing second generation equipment in about the fourth or fifth year of the product cycle, a point roughly comparable to that in the economic life of System 360 when purchases began to decline because no late cycle discount was available. Greyhound invested $48 million in second generation equipment and earned book profits of $4.25 million.[40] These profits, made with the benefit of the technological discount, afforded a fair basis for calculating the extent of damages caused by the

elimination of the technological discount on System 360.

Greyhound purchased 360 equipment almost exclusively in the early years of its product cycle. These purchases were made prior to IBM's multiplier increase. Greyhound invested $171 million in 360 equipment, and the expected profit was at least $20 million. These profits, made with the benefit of the more favorable multiplier, afforded the basis for a just and reasonable inference of the amount of damage sustained by Greyhound from its preclusion from early cycle 370 purchases by IBM's manipulation of the multiplier.

■ Finally, Greyhound introduced testimony that it had planned to invest at least $50 million per year in IBM computer equipment in the years 1969 through 1972, but that it was unable to do so because of IBM's purchase-restricting practices. Such an annual investment would appear reasonable in light of Greyhound's investments in 360 equipment. *See* note 26 *supra.* Using as a guideline the profit figures Greyhound presented for its $171 million investment in 360 equipment, the jury could have calculated Greyhound's damages in these years.[41]

## V. *Evidentiary Rulings*

Greyhound challenges three of the trial court's evidentiary rulings.

1. Greyhound contends that the trial court erred in modifying an earlier ruling of the judge designated pursuant to 28 U.S.C. § 1407 to preside over the pretrial and discovery proceedings in this case. Greyhound asserts that an order of the pre-

---

**40.** Greyhound argues that its second generation profit figure is over $13 million if $9.5 million received in settlement of litigation is added to the $4.25 million. Since the $4.25 million figure provides one reasonable basis for calculating Greyhound's damages due to the reduction of the technological discount, we need not decide whether Greyhound has made a sufficient showing that the $9.5 million should also be included.

IBM contends that these profit figures ignore the fact that Greyhound sold some second generation equipment at less than book value after Greyhound elected to devote its resources to third generation equipment. But there is no evidence that any losses sustained in the sale of

second generation equipment were not deducted from book profits to arrive at the $4.25 million figure.

**41.** Most of the testimony concerning Greyhound's damages came from Greyhound's president. An interested witness may testify as to the amount of damage so long as the record reflects his competency and the factual basis for his conclusions. *See Flintkote Co. v. Lysfjord,* 246 F.2d 368, 394 (9th Cir. 1957). Since this condition is satisfied here, it is for the jury to determine the weight and credit to be accorded his testimony. *See Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 567, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

trial judge required IBM to object by a given date to the admission of documents obtained by discovery, that IBM waived its right to object on the ground of hearsay by failing to make such an objection by the date fixed, and that the trial judge erroneously permitted IBM to raise the hearsay objection at trial.

One district judge in a multi-judge court may modify the interlocutory order of another for "cogent reasons." The question on review is whether the second judge abused his discretion. *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963); *Castner v. First National Bank*, 278 F.2d 376, 380 (9th Cir. 1960). Greyhound has not indicated what the excluded documents were, what they contained, or what they would prove. It has demonstrated no prejudice, simply asserting without particularization that it was forced to alter its strategy at trial. On the basis of this showing, we decline to hold the trial judge abused his discretion.

2. The district court excluded all reference to a consent decree entered into between IBM and the United States in settlement of antitrust litigation some 20 years ago. The decree required IBM to abandon its prior "lease only" policy and offer its computers for sale, and included other provisions that contributed to the establishment of leasing companies. Determining whether such a decree should be placed before the jury requires a balancing of probative value against prejudicial impact, a task committed to the discretion of the trial court. *Control Data Corp. v. IBM Corp.*, 421 F.2d 323, 326 (8th Cir. 1970). See generally *City of Burbank v. General Electric Co.*, 329 F.2d 825 (9th Cir. 1964). In this case, as Greyhound candidly admits, striking the balance "is a close question." We are unable to say the trial court abused its discretion in resolving it as it did. There is merit, however, in Greyhound's contention that IBM's opening argument suggests that the trial judge must be alert to protect Greyhound from arguments that may mislead the jury unless the jury is informed of the decree and its terms.

3. Finally, Greyhound objects to rulings by the trial court precluding testimony as to manufacturers that have gone out of business. The rulings did not prejudice Greyhound since the desired testimony was later admitted.

## VI. *Breach of Contract*

We agree with the district court that Greyhound's separate claim that IBM breached a contractual obligation to provide services to first users of IBM machines was not supported by sufficient evidence to carry it to the jury. Viewed most favorably to Greyhound, the evidence showed only that some unspecified customers had bargained on an individual basis for some unspecified allotment of only generally defined services, and that some undetermined portion of these services had been withheld.

Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

MOORE, Circuit Judge, concurring:

I concur in so much of the majority opinion as affirms the direction of a verdict on the breach of contract count and I also concur in the remand for trial of the monopolization and the attempt to monopolize claims. Since a remand requires a trial, in my opinion any comments on the effect of such evidence as may be developed therein is premature and inadvisable. All that is before us is the evidence adduced by plaintiff in its direct case. Ultimately the case will go to the jury on all the evidence offered by plaintiff and defendant. This evidence will have to be weighed by the jury in the light of a judge's charge as to the legal background against which it will resolve the facts, including motive, intent and credibility.

As to evidentiary rulings, I would also leave them to the trial judge. He should be allowed to exercise his discretion to admit or exclude as the situation may then exist rather than be told in advance how to rule.

There will be ample opportunity for a reviewing court to examine the jury's ver-

dict, the court's ruling on evidence, the charge and the evidence upon which it is based, when, as and if, the record comes before us. In short, all we are required to do at the present time is to pass upon whether there were questions of fact to be resolved by a jury. We say that there were. Until we know the jury's answer, we should not, even in an anticipatory or declaratory way, in my opinion, make any pronouncement as to a record yet unmade.