REID BROTHERS LOGGING COMPANY, an Alaska corporation, Plaintiff-Appellee,

v.

KETCHIKAN PULP COMPANY, a Washington corporation, and Alaska Lumber and Pulp Company, an Alaska corporation, Defendants-Appellants.

Nos. 81–3444, 81–3448.

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 9, 1982.

Decided March 1, 1983.

Peter J. Pfister, Morrison & Foerster, San Francisco, Cal., Richard S. White, Seattle, Wash., Robert D. Raven, San Francisco, Cal., for defendants-appellants.

William L. Dwyer, Seattle, Wash., for Reid Bros.

Before BROWNING, TUTTLE,* and REINHARDT, Circuit Judges.

* Honorable Elbert Parr Tuttle, Senior United States Circuit Judge for the Eleventh Circuit, sitting by designation.

TUTTLE, Circuit Judge:

The defendants-appellants, Ketchikan Pulp Company ("KPC") and Alaska Lumber and Pulp Company ("ALP") come before this Court alleging errors by the district court in finding a conspiracy between the defendants in violation of §§ 1 and 2 of the Sherman Act. 15 U.S.C.A. §§ 1, 2. The appellants also challenge the district court's award of damages to the plaintiff-appellee, Reid Brothers Logging Company ("RBLC"). After a careful review of the extensive record, we find that the district court's holdings are substantially supported by the evidence.

## I. THE CONSPIRACY

### A. *Background*

The alleged conspiracy aimed its tentacles at the timberland of the Tongass National Forest in southeast Alaska.[1] These woodlands, like many national forests, may be logged by private enterprises under contract from the United States Forest Service ("USFS"). The areas eligible for such harvesting, known as "sales," are advertised in advance by the USFS. A minimum bid is fixed by the USFS, and sealed bids are submitted. All bids are on the basis of a certain number of dollars per thousand board feet (MBF). Parties submitting qualifying sealed bids commonly engage in oral auctions; the high bidder receives the so-called "stumpage rights" to log sales subject to USFS regulations.

KPC and ALP established operations in Alaska in the 1950's. As part of a program to promote the development of the Alaskan timber industry, the USFS entered into long-term contracts allotting specific logging areas to each defendant for a fifty-year period. This guarantee of a long-term timber supply was necessary to offset the risks of establishing processing facilities such as pulp plants and sawmills in an untested market.[2] It was not anticipated that these allotments would satisfy all of the defendants' needs, and KPC and ALP were expected to supplement their timber supply through the normal bidding process.

The district court found three other product markets in the southeast Alaska logging industry besides the sale of standing timber. First, the sale of logs by independent "purchase loggers" who acquire timber rights at USFS sales and sell the harvested logs to mills for processing. Second, the sale of logging services by "contract loggers" who harvest timber under contract to a party owning the stumpage rights. The final product market is the processing of logs by pulp plants and sawmills.

The district court found a broad conspiracy by the defendants to dominate all segments of the southeast Alaska timber industry. The conspiracy was manifested by the defendants' 1) refusal to compete with each other for timber sales offered by the USFS, 2) exclusion and destruction of independent mills which would compete for the limited standing timber and log supply, and 3) elimination of purchase loggers and control of contract loggers through the payment of artificially low prices for timber.

### B. *Section 1 of the Sherman Act*[3]

#### 1. *Introduction*

Certain joint conduct by business entities constitutes a *per se* violation of § 1 of

1. Ninety-seven percent of all woodland in southeast Alaska is within the Tongass National Forest.

2. USFS policy in the 1950's and 1960's actively promoted the development of the Alaskan timber industry as a means of providing employment. The defendants were each required to establish a pulp processing facility as a condition of their long-term allotment contracts. Another manifestation of this USFS policy was a requirement that all Alaskan timber undergo some basic manufacturing process in a sawmill

or pulp plant before export. This regulation, known as the primary manufacture rule, made it necessary for all loggers either to own or operate as a supplier to a processing facility.

3. Section 1 of the Sherman Act (15 U.S.C.A. § 1) provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or

the Sherman Act. This category of conduct includes price-fixing (*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940)) and horizontal territorial division (*United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972)). When this type of behavior is proved, a court is blocked from inquiring into the "reasonableness" of the defendants' actions.

■ Absent a showing of a *per se* violation, a court must apply a rule of reason analysis. Under this test, the elements of a cause of action for an unreasonable restraint of trade in violation of § 1 of the Sherman Act are:

(1) An agreement among two or more persons or distinct business entities;

(2) which is intended to harm or unreasonably restrain competition; and

(3) which actually causes injury to competition.

*Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 844 (9th Cir.1980); *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 290 (9th Cir. 1979), *cert. denied* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

We find that the evidence as a whole establishes the existence of a conspiracy between the defendants and that certain acts committed in furtherance of that conspiracy comprised both *per se* and rule of reason violations of § 1 of the Sherman Act.

### 2. *The refusal to compete*

■ The refusal of the defendants to compete for timber sales offered by the USFS or logs marketed by independent loggers was part of a general scheme to reduce the costs of timber acquisition and thereby increase the spread between costs to the defendants and the prices received for end products. This refusal to compete continued from 1959–1975 despite a chronic shortage of timber that persisted throughout that entire period.

The illicit relationship between the defendants dates from the earliest years of their joint presence in Alaska. As early as March 6, 1959, shortly after ALP's establishment of a mill in the Tongass National Forest, A.M. Brooks, KPC's timber manager, sent a letter to Archie Byers, his counterpart at ALP, disclosing information on log prices and log purchase agreements. In that letter, Brooks urged Byers to keep the information "strictly confidential."

By 1969, the defendants had created a geographic border dividing the Tongass National Forest into spheres of influence. In an April 7, 1969, letter to Brooks, George A. Schmidbauer, the general manager of the Crawford Division of Georgia-Pacific Corporation, KPC's parent corporation, wrote that KPC should "bid sales out of [the] K.P.C. area where A.L.P. has dropped out of active bidding."

A 1974 KPC memorandum labeled "CONFIDENTIAL" constitutes irrefutable evidence of a geographical market division. In that memo, D.L. Finney, Brooks' successor at KPC, notes that "it would be most beneficial to ALP and ourselves to realign the operations so that KPC had the West Coast." The document discusses the benefits to each defendant of a geographic redistricting and proposes an "exchange" of certain areas. The memorandum concludes:

> I cannot stress too hard, my feeling about the beenfits (sic) of towing, administration and log transfers and sorting if we can get the best geographical division between ALP and ourselves. It would also strengthen both of us in a competitive position for any outside interest (U.S. Ply or whoever) who tries to compete for sales with us at a later date.

This division of the market, sustained by an uninterrupted pattern of communications up through 1975, resulted in a remarkable record of bidding restraint by the de-

conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation,

or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

fendants. From 1959–1975, ALP and KPC, the two giants of the southeast Alaska lumber industry, bid against each other only three times out of 143 sales by the USFS.[4]

### 3. The elimination and exclusion of competing mills

■ The defendants' conspiracy extended beyond the refusal to compete between themselves. The evidence clearly shows a well-orchestrated and successful effort by KPC and ALP to eliminate existing independent mills and prevent the establishment of new operations through control of the timber supply. By frustrating the efforts of potential entrants into the market, the defendants were able to minimize competition and keep stumpage rates and payments to purchase loggers at artificially depressed levels.

The fate of the Alaska Prince mill provides a well-documented example of the defendants' tactics. After failing in his efforts to prevent the Oji Paper Company of Japan from constructing the mill, KPC's Brooks informed Alaska Prince and all independent loggers supplying KPC that loggers wishing to supply Alaska Prince must be prepared to repay immediately in cash all indebtedness to KPC. In a May 27, 1969, letter to Schmidbauer, Brooks noted that Alaska Prince was "desperately in need of timber" and that Alaska Prince was "beginning to cause [KPC] trouble among the so-called independent loggers" by offering higher prices for logs. Brooks' letter discussed the upcoming Devil's Club No. 2

sale and suggested that KPC "run [the bidding] up on [Alaska Prince] to the point it will really hurt." Brooks noted, however, that KPC must beware of "the danger of making one bid too many."

Less than a month after this letter, Alaska Prince capitulated. On June 24, Brooks wrote Schmidbauer that Alaska Prince had agreed to cease offering higher prices to loggers if KPC would provide it with a log supply. But when Alaska Prince failed to outbid Ed Head, another independent mill operator, for the Devil's Club No. 2 sale, KPC retaliated by refusing to sell Alaska Prince any logs.

On July 17, 1969, Schmidbauer wrote Dave Murdey of KPC:

Don Finney [KPC timber manager] has expressed some concern about bidding all sales regardless of the desirability of the sale and the location in the south Tongass.

As I see the situation, we should bid all sales to keep Ed Head, Alaska Prince Corporation, or Fuji out. If we should decide to let them buy timber on the south Tongass we are going to have to live with them from now on and there is not enough timber for that.

In the fall of 1970, unable to acquire a timber supply, Alaska Prince offered its mill to KPC. KPC acquired the mill in 1971. The district court found that at least five other mills suffered Alaska Prince's fate. The evidence also supports the district court's finding that the defendant blocked the establishment of competing mill

---

4. The defendants' attempts to refute these numbers only lend further support to the district court's findings. The defendants present evidence that they bid against each other five times from 1959–1975. Three of the sales, Shrubby Island, Bear Creek No. 1, and North Trout Creek, were those sales cited by the district court. These sales all occurred in 1970, and this brief flurry of competition between KPC and ALP was found to be the result of a temporary disagreement between the defendants. The fourth allegedly competitive bid, the East Bradfield sale on May 13, 1975, occurred after the filing of the complaint in this action. Finally, at the fifth sale, Douglas Bay and Mitchell Point in 1974, each defendant refused to bid above the USFS minimum and the award

of the sale was decided by a coin flip. There is substantial evidence that this particular refusal to bid was an act in furtherance of the conspiracy. In any case, competition between the defendants on five bids over a 16 year period can hardly refute the overwhelming evidence of wrongdoing in this case.

Defendants' allegations that their failure to compete was the result of natural economic and geographic factors such as the costs of establishing a camp and towing logs must also fall under the weight of the evidence. The documentary evidence shows that ALP and KPC participated in a conscious division of the market and that each defendant refrained from bidding on sales in the other's "area."

facilities by using covertly controlled corporations ("fronts") to bid preclusively on USFS timber sales.[5]

### 4. *Payment of artificially low prices for logs*

■ Finally, the evidence shows that KPC and ALP conspired to pay artificially low prices to loggers. By calculating payments to loggers on the basis of the loggers' costs rather than the value of the logs, ALP and KPC created a network of "captive" loggers heavily indebted to the defendants.[6] With a drop of the executioner's sword, the defendants could cut off a logger's financing, force the logger out of business, and acquire the company or its assets.

The defendants overstate the impact of government regulation on the logging industry. It is beyond question (as recognized by the district court) that the USFS in the 1960's began to discourage certain types of small logging operations. How-

ever, the evidence shows that many loggers, including the plaintiff, had both the resources and the experience to survive and prosper in the changing lumber industry. The fact that RBLC was the only remaining independent purchase logger in southeast Alaska in 1973 was found by the district court to be a direct result of the defendants' conspiracy in restraint of prices.

### 5. *Conclusion*

The evidence shows that the defendants engaged in unlawful anticompetitive conduct pursuant to at least a tacit understanding that each defendant would behave in a particular manner. This finding is supported by both direct and circumstantial evidence. We find that this unlawful agreement constituted a restraint on interstate and foreign commerce in violation of § 1 of the Sherman Act.[7]

---

**5.** The defendants argue that the district court erred in its finding of predatory bidding since there was no evidence that the high prices paid for standing timber would prevent the defendants from covering their marginal costs on the ultimate sale of the processed timber. This rigid objective test, however, has been rejected by this court as the exclusive means of determining the legality of a particular price or bid, *California Products, Inc. v. IBM Corp.,* 613 F.2d 727, 743 (9th Cir.1979); a more subjective test has been adopted, designed to avoid penalizing an innocent miscalculation and to assure appropriate sanctions against those parties that can accomplish their evil ends without violating the rigid criteria of the marginal cost test. *William Inglis, et al. v. ITT Continental Baking,* 668 F.2d 1014, 1034 (9th Cir.1981). Where, as here, there is direct evidence that the defendants aimed to exclude competition in order to enhance their long-term market position, the blind application of a numerical test would only frustrate the intent of the Sherman Act.

**6.** We note especially the so-called "Minami Report," a survey of ALP timber operations prepared by Fukuchi Minami, the woods manager of the Oji Paper Company in Japan, a shareholder of ALP's parent company. In his 1972 report, Minami noted:

> Operation at logging areas which produces about 70 percent of the whole logging quantity is made nominally by the hands of contractors, but, substantially, they are the so-called "thoroughly owned contractors" of the

company subjected even to the guarantee of profits by the same, as a result of which we cannot expect their business efforts as loggers. Such a situation has arisen because the contract price has been and is inappropriate and the deficit owing to this has been covered with growing advance money and, to make matters worse, new contracts for the following year have been made with rent not completely collected. So, we cannot even grasp the ability of the loggers correctly.

**7.** The defendants' challenges to the district court's conclusion that a § 1 conspiracy existed are totally without merit. The defendants' attempts to isolate and attack particular portions of the district court's opinion not only ignore the weight of the evidence, but display an apparent inability to interpret certain portions of the district court order. For example, the defendant ALP alleges in its brief that the finding of the § 1 violation was "not based upon any direct evidence of agreement but on an inference of agreement from circumstantial evidence and what the court described as 'consciously interdependent action.'" Yet, that portion of the district court opinion cited by the defendant reads, "In carrying out their combination and conspiracy, KPC and ALP have operated *both by explicit communications with each other and by consciously interdependent action.*" (Emphasis added). This court does not find it necessary to refute each of the defendants' challenges on an individual basis.

## C. Section 2 of the Sherman Act[8]

The evidence supports the finding of the district court that the defendants violated § 2 of the Sherman Act. Monopoly power is the power to control prices or exclude competition. *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); and *Greyhound Computer Corp. v. International Business Machines,* 559 F.2d 488, 496 (9th Cir.1977), *cert. denied* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). An illegal monopolization under § 2 consists of: 1) the possession of monopoly power in the relevant market, 2) the unlawful acquisition or maintenance of that power, and 3) causal antitrust injury. *Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *Greyhound Computer,* 559 F.2d at 492; *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir.1977).

The district court correctly defined the relevant geographic and product markets and found that the defendants combined to possess over a 90 percent share in those markets. The above-cited evidence shows the existence of a conspiracy based on an intent to monopolize and the occurrence of several overt acts in furtherance of that conspiracy.

## II. THE DAMAGES

### A. Introduction

The defendants also challenge the district court's finding that the plaintiff, RBLC, was injured as the result of the defendants' unlawful conduct and thus entitled to a treble damages award under § 4 of the Clayton Act, 15 U.S.C.A. § 15.[9] To recover under this section, the plaintiff must "establish with some reasonable probability the existence of some causal connection between defendant's wrongful action and some loss of anticipated revenue." *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 392 (9th Cir.1957); *Inglis,* 668 F.2d at 1051.

The district court's findings of damage to the plaintiff may only be overturned if "clearly erroneous." Fed.R.Civ.P. 52(a). It has long been held that "a finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., et al,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *United States v. Missouri River Breaks Hunt Club,* 641 F.2d 689, 694 (9th Cir.1981).

Moreover, the clearly erroneous standard as applied in the present case is tempered by the repeated holdings of the Supreme Court that a lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969);[10] *Eastman Kodak Co. v. South-*

8. Section 2 of the Sherman Act (15 U.S.C.A. § 2) reads:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars, if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

9. 15 U.S.C.A. § 15 provides in relevant part:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue

therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

10. The Court in *Zenith Radio* wrote:

Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damages issues in these cases are rarely susceptible of a kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of a more precise

*ern Materials, Inc.,* 273 U.S. 359, 377–79, 47 S.Ct. 400, 404–05, 71 L.Ed. 684 (1927); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 811 (9th Cir.1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

Despite the long-standing nature of the conspiracy and RBLC's active involvement in the relevant market at all times pertaining thereto, RBLC's claim for damages on this appeal is limited to its loss of revenue at a single logging site, Muddy River No. 3.[11] The damages awarded by the district court rest on the notion that RBLC, in an unrestrained market, could have operated Muddy River No. 3 as an independent purchase logger from 1972–1974. After an exhaustive review of the voluminous record, we find adequate support for the district court's findings of fact and therefore reject the contentions of the defendants that these findings are clearly erroneous.

### B. *The Undisputed Facts*

In determining whether RBLC was injured by the defendants' conspiracy, it is important to bear in mind the chronology of events at the Muddy River site. RBLC purchased the site at a USFS auction in June 1972. Shortly thereafter, RBLC signed with KPC to deliver the timber from that site to KPC at $64/MBF.[12] The agreement contained no provision for periodic renegotiation of the contract price. It was anticipated that RBLC would complete its operations at the site within three years.

Throughout 1972, RBLC faced a severe shortage of capital and thus found it necessary to secure financing for "startup costs" at the Muddy River site. Though the district court makes no explicit findings on the amount of funds needed, the evidence appears undisputed that RBLC required at least $205,000 to finance logging equipment and roadbuilding at Muddy River No. 3 and to pay off previous debtors whose goodwill was necessary for the continuance of operations at Muddy River No. 3.

In order to obtain this financing, RBLC executed a "third party agreement" with KPC whereby its ownership of the Muddy River No. 3 stumpage rights was transferred to KPC. After this transaction, RBLC became a contract logger and operated Muddy River in such capacity until September 10, 1973, when it ceased operations at the site.

In 1973 and 1974, there was a sharp rise in the prices of end products exported from Alaska sawmills and pulp plants. In a competitive market, a certain portion of such a price rise would be "passed through" to the owners of the stumpage rights. Therefore, if RBLC had continued to operate Muddy River No. 3 as a purchase logger from 1972–74, it would have reaped substantial profits.

### C. *The District Court Findings*

#### 1. *The multi-year, non-negotiable contract*

 The finding of the district court that KPC unlawfully imposed a multi-year,

---

proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." (Citations omitted). 395 U.S. at 123, 89 S.Ct. at 1576.

11. In the trial court, the plaintiff also sought damages for losses suffered at the Kah Sheets-Mitchell Point logging sites in 1970. RBLC does not appeal from the court's finding that RBLC could not have operated Kah Sheets-Mitchell Point at a profit in an unrestrained market.

12. The parties recognize (and the district court found) that the effective price offered by KPC for the Muddy River No. 3 logs was in fact somewhat higher than $64/MBF since KPC was to bear additional costs such as towing, rafting, etc. The parties agree that these costs were at least $9.81/MBF which, when added to the contract price, yields an effective offer of $73.81/MBF. The parties disagree whether the standard 14 percent allowance for profit and risk authorized by the USFS should be attributed to KPC or RBLC, but, as discussed *infra,* this dispute is largely irrelevant since the effective price in either case exceeds the district court's finding of the unrestrained market price in 1972 for the Muddy River No. 3 logs.

non-negotiable contract on RBLC for the sale of the Muddy River logs is substantially supported by the evidence. By the spring of 1972, competition for logs in southeast Alaska had been effectively eliminated by the defendants' conspiracy. Competing mills (including Alaska Prince, RBLC's principal log buyer in the 1960's and early 1970's) had been either run out of business or enslaved by indebtedness to the point of becoming "captive mills." By the time RBLC purchased the Muddy River No. 3 sale, its choice of customers for its logs was limited to mills controlled directly or indirectly by the defendants.

Furthermore, the evidence also supports the critical finding of the district court that contractual log prices between a purchase logger and a log buyer would have been renegotiated at least annually in an unrestrained market. Without periodic renegotiation, fluctuations in the market price for logs and their end products would not be "passed through" to the owner of the timber rights. The evidence shows that in the competitive Pacific Northwest timber market, prices are renegotiated on a periodic basis ranging from daily to annually. It was also shown that when the defendants in the present case acted as sellers rather than buyers of logs, prices were renegotiated on at least an annual basis.

Facing these restrictive market conditions, RBLC had no incentive to postpone the execution of the sales contract in hopes of obtaining better terms of sale. Its acceptance of the best terms it could obtain in a restrained market was fully justified.

### 2. *RBLC's ability to obtain financing*

Once it is determined that KPC unlawfully imposed a flat rate, multi-year logging contract on RBLC, the vital question becomes whether RBLC could have obtained financing to start up the Muddy River No. 3 sale as a purchase logger in an unrestrained market. If RBLC could not have obtained this financing, it would have been forced either to transfer the stumpage rights to a third party and operate as a contract logger, or to delay the commencement of oper-ations for another season in the hope that a rise in prices would make financing feasible; either contingency would require a reconsideration of the district court's damage findings.

The evidence, though very close, shows that RBLC could have obtained sufficient financing to operate as a purchase logger at Muddy River No. 3. The district court found that RBLC could have obtained financing from a combination of the personal assets of Glenn and Martha Reid, the proprietors of RBLC, and $100,000 that would have been loaned from the Hammer and Wikan Retail Store.

There can be no question but that the Reids' personal assets were available to RBLC as collateral for loans. The history of the business, as with many proprietorships, shows that the Reids treated the debts of the business as their own. We especially note the personal sacrifices made by the Reids to pay off RBLC's debts following the termination of operations at Muddy River.

An accountant testifying on behalf of RBLC established that the net equity of the Reids and RBLC together in March, 1972 was $216,000. Some evidence was presented by the defendants that these assets were already encumbered and could not have served as the basis for further loans, but this testimony was inconclusive.

Art Hammer testified on behalf of Hammer and Wikan Retail Store. Though Hammer testified that he, his father, and Mr. Andrew Wikan would have been willing to make personal loans to RBLC, the district court discounted this testimony and focused on the ability and willingness of the Retail Store to provide financing. Though the defendants attack the competence of Art Hammer to testify regarding the Retail Store's lending policies, the evidence shows that in his position as store manager, shareholder, and board member, Hammer exercised an important voice in such decisions.

Hammer's testimony reflected the enormous respect accorded the Reids for their business acumen and personal integrity.

Hammer repeatedly stated that the Retail Store would have loaned the Reids large amounts of money on a mere assertion by Glenn Reid that he was receiving a reasonable price for his logs. Hammer's testimony that he, his father and Wikan would not have requested a financing statement is especially important since RBLC's financial condition in 1972, even in the hypothetical unrestrained market, would have given an accountant cause for alarm.[13]

The defendants base their argument that RBLC would have been unable to secure sufficient financing to operate Muddy River No. 3 as a purchase logger on the formula derived by the district court to calculate the amount of damages suffered by RBLC at Muddy River. Applying that formula, the district court found that RBLC's costs at the Muddy River site in an unrestrained market in 1972 would have equalled $71.03/MBF. The formula also shows that RBLC's revenues in an unrestrained market in 1972 would have equalled $70.03/MBF.

The defendants compare these figures to the effective price of at least $73.81/MBF [14] that KPC offered RBLC for its entire Muddy River production and assert (1) that RBLC could not have obtained financing in an unrestrained market when its costs ($71.03) were greater than its revenues ($70.03), and (2) if RBLC was in fact unable to obtain financing from a source other than KPC in the actual 1972 market, it certainly could not have obtained financing in the hypothetical unrestrained market where the market value of its logs ($70.03) was less than the price actually offered by KPC ($73.81).

The evidence demonstrates that these arguments rely on an inaccurate vision of the operation of a competitive timber market. In an unrestrained market, numerous independent mills bid on timber offered by a

purchase logger from a particular sale. Though these bids may on occasion not be high enough to provide a reasonable profit for an independent logger, the evidence shows that the highest of such bids is routinely accepted since *periodic renegotiation* based on end product prices and the logger's costs assures that an independent logger will obtain the most reasonable price the market can offer within any given time period.

The evidence indisputably shows that the financing of startup costs in an unrestrained market typically comes from the mill that has contracted to purchase the logs from a particular site. Given (1) the chronic shortage of logs that persisted in southeast Alaska, (2) a purchasing mill's anticipation of a profit, and (3) the security provided by the Reids' personal assets and the logs themselves, there can be little question that RBLC could have obtained financing from a mill operator in 1972.[15]

The defendants' arguments improperly separate RBLC's sale of the Muddy River No. 3 logs from the securing of financing for the harvesting of those logs. Their proffered analysis, which assumes the existence of RBLC's three-year, non-negotiable contract with KPC even in an unrestrained market, overlooks that RBLC's most important means of obtaining financing is the collateral provided by the logs themselves. To bind a logging company's production to one party and then speculate how it could obtain financing from another postulates anything but an unrestrained market situation; the defendants seek to rely on the district court's unrestrained market price figures while maintaining the most favorable elements of the market they conspired to create.

Nowhere in its brief do the defendants assert that RBLC could not have found a

---

**13.** These dire financial straits of RBLC were primarily the result of the substantial losses suffered by it at the Mitchell Point-Kah Sheets sales in 1970. As previously mentioned, these losses were attributed by the district court to poor logging conditions at the site and were in no way related to the defendants' conduct.

**14.** *See* footnote 12, *supra.*

**15.** We again take note of the outstanding reputation enjoyed by the Reids. Hammer's testimony established the existence of an outside party which would have loaned up to $100,000 to RBLC on Glenn Reid's word alone.

purchaser for its logs in an unrestrained market. Nor does the evidence indicate that a sawmill or pulp plant facing a chronic shortage of logs in an unrestrained market would not make financing available in anticipation of the profit which induced the mill to purchase the logs initially. The logger and the mill may often suffer substantial losses as the result of a falling market or conditions at the logging site less favorable than anticipated; in other cases, however, market prices may soar or costs may be less than anticipated, and both the mill and the logger will reap an unexpected windfall. Unfortunately for the defendants, it was just such a bonanza that their illegal actions prevented RBLC from enjoying in the rapidly escalating market of 1973–1974.

In sum, the evidence adequately supports the following findings of the district court: 1) in a competitive timber market, prices for the sale of logs from purchase loggers to mills are renegotiated on at least an annual basis; 2) RBLC's agreement to sell the entire production of the Muddy River sale to KPC at a fixed, nonnegotiable price was a product of the conspiracy between ALP and KPC to eliminate competition in the Southeast Alaska timber industry; 3) the nonnegotiable price imposed on KPC by RBLC was far below the true value of the Muddy River logs in an unrestrained market from 1972–74; 4) in an unrestrained market, RBLC could and would have obtained the financing necessary to operate Muddy River No. 3 as a purchase logger from 1972–74; 5) in an unrestrained market where contract prices are periodically renegotiated, a certain portion of a rise in the price of end products produced from harvested logs would be passed through to the owner of the stumpage rights; the absence of any provision for renegotiation in the contract between RBLC and KPC establishes the fact of injury or damages; and 6) the defendants' ac-

tions, therefore, deprived RBLC of the substantial profits it could have acquired in the rising market of 1973–74. This proof establishes the amount of damages.

Under these circumstances, we conclude that the trial court correctly refused to let KPC and ALP escape liability for RBLC's substantial losses simply because the noncompetitive, nonnegotiable price KPC imposed upon the plaintiff fortuitously hovered near the unrestrained market price calculated by the district court for 1972, the first year of the contract.[16]

### 3. The third party agreement and the breach of contract

The evidence supports the finding of the district court that RBLC would not have signed away its stumpage rights and agreed to operate Muddy River No. 3 as a contract logger in an unrestrained market. As discussed *supra*, RBLC could have obtained financing without resorting to this drastic measure. The district court also properly found that KPC wrongfully terminated its contract with RBLC in September, 1973.

### C. Conclusion

The other findings of the district court necessary to the finding of damages are also substantially supported by the evidence. The record shows that RBLC could have successfully operated the Muddy River No. 3 site as a purchase logger in an unrestrained market. We thus affirm the district court's award of $1,489,881 in treble damages.

### III. OTHER ISSUES

### A. Effectiveness of ALP Jury Demand

The appellant ALP asserts that the district court improperly allowed RBLC to withdraw its jury request over the objection of ALP in violation of Rules 38(d)[17] and

---

**16.** As previously noted, prices paid by the defendants for logs were established on the basis of the loggers' costs, not the true market value of the logs. Since loggers' costs are not directly related to the market value of the harvested

logs, any similarity between the price offered by the defendants and the unrestrained market price at any given time is largely coincidental.

**17.** Rule 38(d) reads:

39(a) [18] of the Federal Rules of Civil Procedure, 28 U.S.C.A. ALP seeks a remand to the district court for a trial by jury. We find that the consistent efforts of ALP to defeat RBLC's jury request demonstrated ALP's failure to rely on this request and constituted a waiver by ALP of its rights under the Rules.

RBLC and the plaintiffs in four companion cases filed jury demands and motions to consolidate the cases for trial in 1975. On July 28, 1978, the defendants ALP and KPC appeared before District Court Judge Sharp and filed a motion to strike the jury demands. The motion was based on the complexity of the issues presented.

Three months later, following Judge Sharp's August 30 order that the five companion cases be tried separately, the defendants renewed their motion that the RBLC case be tried without a jury.[19] Judge Sharp denied the motion and stated his intention to try the RBLC case first..

In May, 1980, the cases were assigned to Judge Rothstein because of Judge Sharp's illness. At Judge Rothstein's request, RBLC waived its jury demand in order to make possible an earlier trial date. KPC consented to the waiver, but ALP, in a letter to the court dated June 6, 1980, refused to consent and demanded that the case be tried to a jury. RBLC moved to strike this demand, and on July 7, 1980, the district court granted the motion. ALP now comes before this court and asserts that its refusal to consent to the withdrawal of RBLC's jury demand in the manner required by Rule 39(a) entitles it to a trial by jury under Rule 38(d).

▬ Rule 38(d) reads, in part, "A demand for trial by jury, made as herein provided, may not be withdrawn without the consent of the parties."[20] It is widely recognized that this provision is designed to allow parties to rely upon the jury demands of other parties to the same case. *DePinto v. Provident Securities Life Insurance Co.,* 323 F.2d 826, 832 (9th Cir.1963); *Calnetics Corp. v. Volkswagen of America,* 532 F.2d 674, 690 (9th Cir.1976), *cert. denied* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *Rosen v. Dick,* 639 F.2d 82, 87 (2d Cir.1980); *State Mutual Life v. Arthur Andersen & Co.,* 581 F.2d 1045, 1050 (2d Cir.1978); and 5 *Moore's Federal Practice,* ¶ 28.45 at 38–391 to 393(2) (2d ed. 1980). As a practical matter, Rule 38(d) prevents a party from withdrawing its request for a jury trial subsequent to the expiration of the period for a timely demand by the other parties thereby depriving those parties of the right to a trial by jury.[21] In the present case, the persistent efforts of ALP to defeat RBLC's jury request demonstrate that ALP was not relying on that request. Therefore, ALP waived its right to rely on the protections of Rules 38(d) and 39(a).

18. Rule 39(a) reads:

Waiver. The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.

18. Rule 39(a) reads:

By jury. When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

19. In the district court, ALP alleged that both the challenges to RBLC's jury request were made prior to the district court's ruling that the five companion cases be tried separately. The trial court rejected this contention, and ALP does not raise it on this appeal.

20. Rule 39(a), of course, sets forth the manner in which this consent may be granted.

21. Fed.R.Civ.P. 38(b) provides that a demand for trial by jury on particular issues "must be made not later than 10 days after the service of the last pleading directed to such issues." It is not contended that ALP made a timely demand for a jury trial under Rule 38(b); the sole issue is whether ALP was entitled under Rule 38(a) to block the withdrawal of RBLC's jury request.

Although ALP contends that a literal reading of Rule 38(d) compels a retrial, we decline to apply the rule in such a formalistic manner. Rule 1 of the Federal Rules of Civil Procedure advises that the Rules "be construed to secure the just, speedy, and inexpensive determination of every action." As recognized by this Court in *Builders Corp. of America v. United States,* 259 F.2d 766 (9th Cir.1958), "The spirit of the Rules [of Civil Procedure] is that technical requirements are abolished and judgments be founded on facts and not on formalistic defects." *See also United Press Ass'n v. Charles,* 245 F.2d 21, 26 (9th Cir.1957), *cert. denied* 354 U.S. 925, 77 S.Ct. 1378, 1 L.Ed.2d 1435 (1957). Given these guiding principles, we conclude that the district court properly looked beyond the facial language and applied the Rules in a manner consistent with their underlying purpose.[22]

*Palmer v. United States,* 652 F.2d 893 (9th Cir.1981), cited by ALP, is consistent with this holding. In that case, a defendant made a timely request for a jury trial. The trial court overlooked or disregarded the demand, but the party remained silent when the case commenced without a jury. On appeal, this court recognized, "Conduct of the parties which evinces consent and appears in the record is sufficient to constitute a proper withdrawal and waiver (citations omitted)." But the court held that mere silence was insufficient to constitute a withdrawal of a jury trial demand. In the present case, the conduct of ALP fills the void left by the silence in *Palmer* and constitutes an affirmative withdrawal of any reliance on RBLC's jury demand. In these circumstances, a literal reading of Rule 38(d) would act as an instrument of delay and frustrate the purposes of the Federal Rules of Civil Procedure.

We are fully aware of this court's admonition that every reasonable presumption be indulged against the waiver of a trial by jury. *Pradier v. Elespuru,* 641 F.2d 808, 811 (9th Cir.1981). But where, as here, the appellant unambiguously and determinedly acted to defeat RBLC's jury request, the only reasonable conclusion is that the appellant was not relying on that request and thus was not entitled to invoke the protection of Rule 38(d).

### B. *Statute of Limitations*

The defendants invoke the four year statute of limitations of 15 U.S.C.A. § 15b[23] and argue that the district court improperly premised liability on events occurring before March 13, 1971, four years prior to the filing of the complaint. The defendants point specifically to the district court's findings of preclusive bidding in the mid-1960's and the central role in the conspiracy of A.M. Brooks, KPC's timber manager, who retired in 1969.

It is well-settled that a plaintiff may introduce background evidence to establish a continuing course of conduct or to cast light on the character of an existing conspiracy. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1415–16, 8 L.Ed.2d 777 (1952); *United Mine Workers v. Pennington,* 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593 n. 3, 14 L.Ed.2d 626 (1965); *Independent Taxi Cab Operators Ass'n v. Yellow Cab Co.,* 278 F.Supp. 979, 986 (N.D.Cal. 1968). Furthermore, a plaintiff is entitled to a full recovery of damages suffered during the limitations period "even though some undetermined portion of those damages was the proximate result of conduct occurring more than four years prior to the filing of the [complaint]." *Zenith Radio,* 401 U.S. 321 at 333, 91 S.Ct. 795 at 803, 28 L.Ed.2d 777.

In the case before us, the background evidence is necessary to establish the defendants' role in the limited market faced by RBLC in 1972; moreover, the evi-

---

**22.** For an extensive discussion of the liberal interpretation of the Federal Rules of Civil Procedure, *see* 2 *Moore's Federal Practice,* ¶ 1.13[1] at 281–287 (2d ed. 1980).

**23.** 15 U.S.C.A. § 15b provides in relevant part:

Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued.

dence clearly shows the continuing existence of the conspiracy through at least 1975. The contract imposed on the plaintiff by KPC at Muddy River No. 3, an overt act in furtherance of the conspiracy, could only have been achieved in this atmosphere of cooperation between the defendants. The mere fact that the conspiracy began in 1959 will not bar recovery given the substantial evidence of sustained illegal activity during the limitations period.

## C. *ALP's Liability*

Defendant ALP argues that it should be absolved from liability because it was in no way responsible for the events which resulted in RBLC's heavy losses at Muddy River No. 3. This contention rests on the flawed logic that RBLC's damages were solely a product of the actions of KPC at Muddy River.

▮ An injured plaintiff seeking damages is not required to show privity or any manner of direct dealing with the defendant. *Mandeville Islands Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *South Carolina Counsel of Milk Producers, Inc. v. Newton,* 360 F.2d 414, 417 (4th Cir. 1966). A party that participates in a conspiracy "must ... share responsibility for the resulting damage, including that occasioned by activities in which it did not directly participate, or from which it did not directly benefit." *Twentieth-Century Fox Film Corp. v. Goldwin,* 328 F.2d 190, 212 (9th Cir.1964); see also *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358, 361 (9th Cir.1965).

▮ In and of itself, KPC's behavior at Muddy River No. 3 did not create a cause of action for RBLC under § 4 of the Clayton Act. 15 U.S.C.A. § 15. The harm suffered by RBLC was actionable because of its causal connection to the conspiracy between the defendants. KPC's actions were not only a manifestation of the conspiracy, but

were made possible only by the prior destruction of competition and the continuing cooperation between KPC and ALP. In these circumstances, ALP must share the blame for the damages to RBLC.

## D. *The Admissibility of Exhibit 692*

▮ The defendants challenge the district court's admission of Exhibit 692, the so-called "Minami Report." The defendants assert that the report constituted inadmissible hearsay and provided the sole support for the district court's finding that the defendants purposefully set log prices at levels below market value. The record, however, discloses the following facts upon which the district court could have found that the report was an admission by a party-opponent under Fed.R.Evid. 801(d)(2)(C), 28 U.S.C.A.[24]

The report, entitled "Survey Report on ALP Woods Operation," was prepared by a Mr. Minami, an employee of the Oji Paper Company of Japan. The Oji Paper Company is a shareholder of ALP's parent company, Alaska Pulp Company ("APC"). This survey was prepared at the request of Mr. Nishizawa, ALP's chairman of the board. Mr. Minami spent 41 days in Alaska accumulating research for his report. During this time, he was given free access to all of ALP's books and records, and he was accompanied by ALP employees on visits to ALP logging camps. The final report was translated into English at APC headquarters in Japan, and Mr. Minami presented the report to a meeting of the ALP Log Committee, a meeting attended by numerous ALP executives. Following the meeting, a copy of the report was circulated to ALP officers and managers. Given these circumstances, there can be little question that Minami was "authorized" by ALP to make statements regarding the entire scope of ALP's woods operations, including the price structure for the purchase of logs. Therefore, we find that the district court

---

24. Rule 801(d)(2)(C) provides in part:
 (d) A statement is not hearsay if—
 (2) The statement is offered against a party and is

 (C) A statement by a person authorized by him to make a statement concerning the subject.

properly allowed the admission of Exhibit 692 under Fed.R.Evid.Rule 801(d)(2)(C).[25]

#### E. *Other Evidentiary Challenges.*

The defendants challenge several other evidentiary rulings of the district court. A ruling by a trial judge on the admissibility of evidence will be overturned only if there was a clear abuse of discretion. *Kaplan v. International Alliance of Theatrical, etc.,* 525 F.2d 1354, 1362 (9th Cir.1975); *Pierce Packing Co. v. John Morrell & Co.,* 633 F.2d 1362 (9th Cir.1980). We find that the trial court's actions survive the application of this test.

In any event, the court's rulings constitute harmless error under Fed.R. Civ.P. 61,[26] 28 U.S.C.A. There is no showing that the trial court gave determinative weight to the challenged evidence which was admitted at trial, or that excluded evidence would have altered the district court's findings. The challenged evidence, pertaining to the existence of a conspiracy under Sections 1 and 2 of the Sherman Act, is but a drop in the bucket in light of the substantial evidence of wrongdoing in this case. In this context, there can be no showing that the court's actions affected "the substantial rights of the parties." Fed. R.Civ.P. 61. *See Department of Water & Power of City of Los Angeles v. Okonite-Callender Cable Co., Inc.,* 181 F.2d 375, 382 (9th Cir.1950); *Purer & Co. v. Aktiebolaget Addo,* 410 F.2d 871 (9th Cir.1969).

#### IV. CONCLUSION

The district court's findings of the existence of a conspiracy in violation of §§ 1 and 2 of the Sherman Act and causal antitrust injury to the plaintiff are substantially supported by the evidence. The trial court did not abuse its discretion in any of its procedural and evidentiary rulings.

The judgment of the trial court is AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

I respectfully dissent from Section III A of the majority's opinion holding that the defendants forfeited their right to a jury trial. I do not believe that Rules 38 and 39 of the Federal Rules of Civil Procedure contemplate that one party to the litigation shall have an exclusive continuing option to determine whether a trial shall be by court or jury merely because the other side vigorously contended at one point that a court trial was mandatory. In my opinion, far more is required before we can declare that a party has waived its right to a jury trial. To create an implied waiver from defendants' conduct here denigrates the principle that every reasonable presumption be indulged against the waiver of a right to trial by jury. *Pradier v. Elespuru,* 641 F.2d 808, 811 (9th Cir.1981).

One problem with the majority's conclusion is that it ignores the practicalities of litigation. Whether or not a party desires a jury trial may well depend on what the specific alternative is. Judges are not fungible commodities. One side may prefer a trial before a particular judge to a trial by jury. For the very same reasons, the other side may not. When conditions change and a new judge is assigned to preside over the trial the views of both sides may change, as

---

**25.** The Notes of the Advisory Committee on the Rules of Evidence make it clear that the common law requirement of some jurisdictions that a person authorized to speak for a principal must make a statement to a third person before that statement can be introduced as an admission has been legislatively overruled by Rule 801(d)(2)(C). *See Kingsley v. Baker/Beech-Nut Corp.,* 546 F.2d 1136, 1144 (5th Cir.1977); *Zenith Radio Corp. v. Matsushita Electric Industrial Company, Ltd.,* 505 F.Supp. 1190, 1246 (E.D.Pa.1980).

**26.** Federal Rules of Civil Procedure Rule 61 provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or admitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

they did here. A party that initially insisted that a jury trial was essential to the very survival of our system of justice may suddenly decide that a trial before a judge is by far the wiser course. The opposing parties, having previously proclaimed vigorously that there was no right to a jury trial, may just as suddenly conclude that a trial by jury is a precious heritage which they have a constitutional right to invoke. There is nothing mystifying or surprising about such tactical changes by the parties. However, the underlying principle that overrides what is good or bad for a particular side at a particular time is the right to trial by jury. That right was just as important when defendants asserted it shortly before trial as it was when plaintiff successfully invoked it at the commencement of the proceedings.

Once a jury trial is demanded by one party in a timely manner, all parties have a continuing right to insist on a jury trial and to object to any attempted waiver by the party that originally invoked the right; the parties are also free to change their respective positions regarding a jury trial, as the two sides did here. It is clear to me that defendants had no intention of waiving all of their rights under Rule 38(d) and 39(a), and I do not believe that asserting a position that plaintiff was not entitled to a jury trial is conduct that should be held to constitute an unintended waiver.

Merely because defendants argued at an early stage in the litigation that plaintiff did not have a right to a jury trial does not in any way suggest that, if the court concluded they were wrong, defendants would be willing to waive their continuing right to object to a subsequent change in position by plaintiff. Certainly, there would be no reason for defendants to give up their right to change their own position if circumstances changed. From defendants' standpoint, the implied waiver suggested by the majority served no purpose, other than to put the plaintiff in the position the majority finds it was in—having exclusive control over the decision whether the trial would be by jury or by court, with the right to make that final unilateral decision based on the circumstances that existed just prior to the time of trial. I see no reason why objecting to an opponent's jury demand, whatever the basis for the objection, should entail such a consequence.

The majority's assertion that defendants were not relying on plaintiff's jury demand since they initially opposed it seems to me to be only partially correct. It is true that, as the majority says, that defendants did not initially rely on that demand in order to secure a jury trial. Defendants did, however, rely from the outset on the Rules that provide that once a demand is made, it cannot be withdrawn unilaterally. That reliance was, in my opinion, justified.

I do not believe that this is a case involving "technical requirements" or "formalistic defects," nor that the admonition of Rule 1 regarding "speedy and inexpensive determination of every action" provides a justification for dispensing with the right to trial by jury. While I understand the majority's reluctance to undo the results of a substantial investment of judicial time and resources, and to reward the defendants for their belated conversion to a belief in the sanctity of trial by jury, I believe that defendants were entitled under the Rules to insist on a jury trial, that they did not waive their right to trial by jury, and that a court verdict cannot stand.